AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.  '22  MJ3495 |
| Cellphone in Joker Case FP&F No. 2022565600013601 Item 0010 ("Target Device 1") | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

 I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the   Southern   District of    California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

 ☑ evidence of a crime;

 ☐ contraband, fruits of crime, or other items illegally possessed;

 ☐ property designed for use, intended for use, or used in committing a crime;

 ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § § 1324(a)(1)(A)(i), (A)(ii), (v)(I) & (v)(II) | Bringing in Illegal Aliens Without Presentation, Transportation of Illegal Aliens, and Conspiracy and Aiding and Abetting the Same |
| 31 U.S.C. § 5332 | Bulk Cash Smuggling Into or Out of the United States |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent Alexander C. Susral, Jr., incorporated herein by reference.

 ☑ Continued on the attached sheet.

 ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alexander C. Susral, Jr., U.S. Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
   telephone    *(specify reliable electronic means)*.

Date:   09/26/2022

_____
*Judge's signature*

City and state:  San Diego, California    Honorable Andrew G. Schopler, U.S. Magistrate Judge
                   *Printed name and title*

# ATTACHMENT A-1

## PROPERTY TO BE SEARCHED

The following property is to be searched:

> Cellphone in Joker Case
> FP&F No. 2022565600013601 Item 0010
> (“**Target Device 1**”)

**Target Device 1** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector located at 311 Athey Avenue, San Ysidro, California 92173.

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1, A-2, and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **January 20, 2022, up to and including September 9, 2022**:

    a.    tending to indicate efforts to smuggle aliens from Mexico into the United States and facilitate the transportation of smuggled aliens within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and the transportation of smuggled aliens;

    d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

all of which are evidence of violations of 8 U.S.C. §§ 1324 (a)(I)(A)(i), (A)(ii), (A)(v)(i), and (A)(v)(ii).

## AFFIDAVIT

I, Alexander C. Susral, Jr., being duly sworn, hereby state as follows:

### INTRODUCTION

1.     I submit this affidavit in support of applications for warrants to search the following electronic devices (collectively, the "**Target Devices**"):

> Cellphone in Joker Case
> FP&F No. 2022565600013601 Item 0010
> (**"Target Device 1"**)
>
> Black Samsung Cellphone with Picture of Cruz on Case
> FP&F No. 2022565600013601 Item 0032
> (**"Target Device 2"**)
>
> Black Motorola Cellphone
> FP&F No. 2022565600013601 Item 0002
> (**"Target Device 3"**)

as further described in Attachments A-1, A-2, and A-3, and to seize evidence of crimes, specifically, violations of 8 U.S.C. § 1324 (a)(I)(A)(i), Bringing in Illegal Aliens Without Presentation, 8 U.S.C. § 1324(a)(I)(A)(ii), Transportation of Illegal Aliens, 8 U.S.C. § 1324(a)(I)(A)(v), Conspiracy/Aiding or Abetting the same, and 31 U.S.C. § 5332, Bulk Cash Smuggling Into or Out of The United States, as further described in Attachment B. Although agents are investigating several specific violations of 8 U.S.C. § 1324, for ease of reference in this affidavit, I will refer to the collective violations as 8 U.S.C. § 1324 or "alien smuggling."

2.     The requested warrants are related to the investigation and prosecution of Raul Javier CRUZ-Salas for violations of 8 U.S.C. § 1324 and bulk cash smuggling. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector located at 311 Athey Avenue, San Ysidro, California 92173.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.      I have been a Border Patrol Agent (BPA) with the United States Border Patrol (USBP) since 2011 and am currently assigned to the Boulevard Station Abatement Team (BLV/SAT). I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for thirteen years.  I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and the utilization of illegally obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have

resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses. It is also common for alien smugglers to use more than one cellphone to facilitate their alien smuggling activity.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to

make smuggling arrangements, receive instructions, and report their locations after crossing.  It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.    Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data.  In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.    This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a.    tending to indicate efforts to smuggle aliens from Mexico into the United States and facilitate the transportation of smuggled aliens within the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and the transportation of smuggled aliens;

c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and the transportation of smuggled aliens;

4

d.   tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.   In February 2022, Border Patrol Agents investigating the Adrian Torres Transnational Criminal Organization (TCO) became aware of CRUZ while investigating Fredy Eduardo JUAREZ-Abrego (JUAREZ). Agents believe JUAREZ was a recruiter, load driver, coordinator, logistician, enforcer, and money courier for the TCO. In February 2022, JUAREZ sold his Mercedes Benz C-300 to CRUZ, and agents began investigating CRUZ to determine if there were any further links to the TCO and the related smuggling operations. CRUZ's driver's license and a small claims judgment listed CRUZ's address as 1448 S. Woods Ave., Apt. C, Los Angeles, CA 90022 (H-1), and the most recent telephone numbers associated with CRUZ were (323) 568-7196 (T-1) and (323) 608-3987 (T-3).

12.   Agents involved in the investigation recognized the S. Woods Ave. address because it had been previously described by an alien smuggler (S-1) during a post-arrest interview. On January 20, 2022, S-1 was arrested for transporting two undocumented individuals. Post-arrest, S-1 claimed to have successfully smuggled for the same organization on December 27, 2021, December 29, 2021, and on two additional dates that S-1 could not remember. Department of Homeland Security (DHS) records indicate that S-1's vehicle passed through the Pine Valley Border Patrol Checkpoint on December 14 and December 17, 2021, among other dates.  Based on that checkpoint's proximity to the border, its location on one route from that area to Los Angeles, and CRUZ's crossings

5

1  described below, I believe these were likely the additional successful events described by

2  S-1. During a follow-up interview, S-1 indicated that he/she delivered the smuggled

3  individuals to an alley between a Winchell's Donut House at 1455 S. Atlantic Blvd., Los

4  Angeles, CA 90022, and an apartment complex at 1448 S. Woods Ave., Los Angeles, CA

5  90022 (H-1 is Apt. C within that complex). S-1 further stated that the individuals who paid

6  him/her took possession of the undocumented individuals and walked them across the alley

7  into the apartment complex following the transaction. The following picture shows the

8  location of the Winchell's Donut House, the alley, and the apartment complex described

9  by S-1:



23  S-1 consented to a search of his/her cell phone and provided T-1 as the number of the

24  person he/she was communicating with regarding human smuggling. A search of S-1's

25  phone revealed WhatsApp messages related to the smuggling of humans for profit dating

26  back to November 2021.

27          13.    After the interview, agents conducted surveillance around H-1 and collected

28  license plate numbers from vehicles parked around the apartment complex.  During this

surveillance, agents saw a white Mazda Protégé ("TV-1") parked adjacent to the apartment complex. Record checks on TV-1 revealed that it was registered to CRUZ at H-1. Additional records checks found three other vehicles registered in CRUZ's name at H-1, including a white Toyota Sienna ("TV-3").

14.   In my training and experience, after a successful smuggling event, the smuggling coordinator often will collect the smuggling fee from the undocumented individual's family members or sponsors. Fees vary, but in general, smugglers charge several thousand dollars per person. Payments often are in cash. Once the smuggling coordinator collects this smuggling fee, they will pay the driver and any smuggling-related expenses such as gas, food, hotel, etc. Once all the related expenses have been paid and the smuggling organization in the United States takes its "cut," the remainder will be transported to Mexico to be paid to conspirators there.

15.   DHS records show that CRUZ crossed into Mexico within 48 hours of each of S-1's suspected successful smuggling events. Based on the information above, S-1 was likely successful in smuggling undocumented individuals to Los Angeles on December 14, 2021. CRUZ crossed into the United States from Mexico on December 16, 2021, at 9:44 p.m. driving TV-1 with his wife and a sixteen-year-old female. Records show TV-1 then passed through Oceanside, California on Interstate 5 (I-5) northbound at around 10:36 p.m. (The time and date of CRUZ's entry into Mexico for that trip is not known; DHS systems do not capture all entries into Mexico.)

16.   Based on information above, S-1 also was likely successful in smuggling undocumented individuals to Los Angeles on December 17, 2021. DHS records show CRUZ crossed into Mexico on December 19, 2021, at 1:09 p.m. driving TV-1. DHS records show CRUZ crossed back into the United States at 5:12 p.m. with his wife and two young children.

17.   Based on her statements above, S-1 also claimed to successfully smuggle undocumented individuals to Los Angeles on December 27, 2021. DHS records show on

December 28, 2021, CRUZ crossed into Mexico driving TV-3 at 8:41 p.m.  CRUZ crossed back into the United States in TV-3 with his wife at 11:24 p.m.

18.    S-1 also claimed to have successfully smuggled undocumented individuals to Los Angeles on December 29, 2021.  DHS records show on December 30, 2021, at 3:02 a.m., CRUZ crossed into Mexico driving TV-1.  CRUZ crossed back into the United States with his wife and a sixteen-year-old female at 10:32 p.m. on December 30, 2021.  I believe in each of these crossings shortly after the reported smuggling event, CRUZ likely transported part of the smuggling fee to co-conspirators in Mexico.  In my training and experience, persons transporting currency obtained through illegal means sometimes will bring family members, including children, to make the travel appear innocuous.

19.    On February 24, 2022, agents arrested S-2 for transporting two undocumented individuals.  During his post arrest interview, S-2 claimed to have previously smuggled four undocumented individuals from Boulevard, California to El Cajon, California on February 23, 2022, and further claimed to have used WhatsApp during the smuggling event.  After smuggling the four undocumented individuals to El Cajon, S-2 was given the Winchell's Donut House, 1455 S. Atlantic Blvd., Los Angeles, CA 90022, as the location where he would be paid.  S-2 drove to the Winchell's Donut House and met a man who paid him $4,000 for the smuggling event.  S-2 identified CRUZ from a six-pack photo lineup as the individual who paid him at Winchell's Donut House. S-2 consented to a search of his cell phone and provided T-1 as the number of the man who paid him at Winchell's Donut House.

20.    On March 22, 2022, agents arrested S-3 for transporting three undocumented individuals.  During his post arrest interview, S-3 claimed that on March 15, 2022, he successfully smuggled three undocumented individuals from San Diego to Los Angeles. S-3 further stated that on March 20, 2022, he smuggled two undocumented individuals from San Diego to Los Angeles.  Both times, S-3 stated that he delivered the undocumented individuals to 1455 S. Atlantic Blvd., Los Angeles, CA 90022 (the address for the Winchell's Donut House).  S-3 said he was paid $1,000 per undocumented individual for

a total of $5,000.  S-3 identified CRUZ from a six-pack photo lineup as the man who paid him at 1455 S. Atlantic Blvd., Los Angeles, CA 90022.  S-3 added that he saw the family members or sponsors pay CRUZ for the release of the undocumented individuals.  (Persons in the United States often pay smugglers the fee for smuggling someone into the United States, in exchange for the smuggled person's release.  Law enforcement typically refers to the former as "sponsors.")  S-3 told agents he used WhatsApp to communicate during the smuggling events.  S-3 consented to a search of his cell phone and provided T-1 as the phone number of the man who paid him.

21.     On May 24, 2022, agents arrested S-4 and S-5 for transporting two undocumented individuals.  During S-4's post-arrest interview, he stated he previously picked up five undocumented individuals and instructed to drive to 1455 S. Atlantic Blvd., Los Angeles, CA 90022 (the address for Winchell's Donut House), to drop off the undocumented individuals.  S-4 provided T-3 as the number he was communicating with during the smuggling event. S-4 stated he was instructed to go through an alley behind the donut shop until he reached a two-story house with a garage.  S-4 located the garage, parked, and went inside with the five undocumented individuals.  S-4 said he saw two men in the garage holding rifles as well as additional weapons.

22.     On June 3, 2022, agents arrested S-6 for transporting two undocumented individuals.  During his post-arrest interview, S-6 stated that he was recruited to smuggle by a subject known to him as "Cholo Pollo." S-6 provided T-3 as the phone number for Cholo Pollo and stated he had successfully smuggled for Cholo Pollo five times.  S-6 stated that he would drive noncitizens from the San Diego, California area to a stash house located at 1448 South Woods Ave., Apt. C, Los Angeles, CA (H-1). S-6 stated the undocumented individuals entered H-1 through a garage door in the alley.  S-6 identified CRUZ from a six-pack photo lineup as Cholo Pollo. S-6 also stated that most of his communications with Cholo Polo were via WhatsApp messenger.

23.     On June 7, 2022, agents arrested S-7 for transporting two undocumented individuals in his vehicle.  During his post-arrest interview, S-7 stated that he answered a

Facebook advertisement for drivers who "would be paid well." S-7 stated he was then contacted on Facebook by a person with the profile name of "Vanessa Fuentes" who gave him a Mexican phone number for an unknown individual. Between March and June, an individual reached out to S-7 multiple times on WhatsApp Messenger but due to other obligations, S-7 was unable to complete any jobs. On May 29, 2022, the individual contacted S-7 and asked if he wanted to work on May 30, 2022. S-7 agreed and successfully picked up one undocumented individual from the area of Interstate 8. S-7 was then instructed via WhatsApp to drive to the undocumented individual to a Winchell's Donut House at 1455 S. Atlantic Blvd., Los Angeles, CA 90022. S-7 showed agents the WhatsApp Messenger conversation, and the number S-7 was communicating with regarding the smuggling venture was T-3.

24. On June 26, 2022, agents arrested S-8 for transporting two undocumented individuals in her vehicle. During her post-arrest interview, S-8 claimed to have been recruited by an unknown subject through a Facebook advertisement who communicated with her via a Mexican phone number. S-8 admitted having successfully smuggled undocumented individuals from Jacumba, California to an apartment complex located behind the Winchell's Donut House at 1455 S. Atlantic Blvd., Los Angeles, CA on three prior occasions. Utilizing Google Maps, S-8 identified the apartment complex as 1448 S. Woods Ave., Los Angeles, CA (H-1 is Apt. C in that complex). S-8 said the undocumented individuals entered the apartment complex through the last garage door in the alley. S-8 stated that "Mi Hermano" contacted her and provided directions during the smuggling event. S-8 also stated that Mi Hermano took custody of the undocumented individuals at the apartment complex and paid her $1,000 to $1,300 per undocumented individual that she successfully delivered. S-8 provided Mi Hermano's contact number as (323) 608-3958 (T-2). S-8 identified CRUZ from a six-pack photo lineup as "Mi Hermano."

25. On July 5, 2022, agents arrested S-9 for attempting to transport six undocumented individuals in a Ford Explorer. Record checks on the vehicle indicated that it was registered to S-9 at H-1. During a post-arrest interview, S-9 admitted picking up the

undocumented individuals in Jacumba.  S-9 stated that he was on his way to Los Angeles when he was pulled over, and that he was guided by "Adrian" on WhatsApp.

26.     A search of DHS systems determined that three days earlier, on July 2, 2022, the same Ford Explorer traveled westbound from the Pine Valley Border Patrol checkpoint on Interstate 8 at 6:35 a.m. (Interstate 8 runs east-west a few miles north of the U.S.-Mexico border and intersects with several freeways that run north-south through California, including I-5.)  At 8:03 a.m., DHS systems captured the Explorer traveling northbound on I-5 near Oceanside, California, which is a route that leads to the Los Angeles area.  At about 9:24 a.m., a pole camera captured what appeared to be the same Explorer arriving at the alley behind H-1.  Prior to the Explorer arriving, multiple individuals were in the alley and appeared to be waiting for someone.  When the Explorer arrived, multiple occupants exited the vehicle from the passenger side. The subjects waiting in the alley appeared to receive them.  I believe the Explorer was delivering undocumented individuals to H-1. Below are still shots of the Explorer as it traveled by freeway to H-1 (top two photographs) and what agents saw at H-1 through the pole camera when the Explorer arrived (bottom photograph).



27.    On August 16, 2022, the Honorable Gail J. Standish, United States Magistrate Judge for the Central District of California, issued a federal search warrant authorizing the search of H-1, i.e., the apartment and separate garage (the "August 16 Warrant").   The August 16 Warrant authorized the seizure of evidence, fruits, and instrumentalities of the Subject Offenses based on probable cause that CRUZ, with others, used H-1 to receive, hold, and/or temporarily house undocumented individuals recently smuggled into and within the United States and that evidence of such crimes would be found at H-1. This warrant was filed in the Central District of California as 22-MJ-3197.

28.    On August 21, 2022, at approximately 10:49 a.m., via pole camera, agents saw CRUZ, his wife, and an unknown individual carrying a full trash bag enter the alley behind H-1 and get into a blue Subaru Outback (TV-5).  TV-5 is registered to CRUZ at H-1; a court-authorized tracking device was on TV-5. Tracking data indicated that from August 21 to August 23, 2022, TV-5 traveled to a private residence in Tipton, Indiana. TV-5 was stationary at the private residence in Indiana for three and a half hours before heading back towards California. On August 25, 2022, TV-5 arrived back in Los Angeles at approximately 6:33 p.m. Based on my training and experience, I believe CRUZ transported an undocumented individual from H-1 to the residence in Indiana. Smugglers sometimes will do this for an additional fee beyond the fee for smuggling the individual into the United States.

29.    On August 31, 2022, at approximately 12:02 p.m., via pole camera, agents saw CRUZ, S-9, and an unknown individual, enter the alley behind H-1 and get in TV-5. Tracking data indicated that from August 30 to September 1, 2022, TV-5 traveled to a private residence in Kirkland, Washington. TV-5 was stationary at the private residence in Washington for eight minutes before heading back towards California. Moreover, immediately before and after arriving at the private residence, TV-5 stopped at a Walmart. These stops at Walmart immediately before and after a suspected smuggling event, likely represent CRUZ receiving money from the sponsors and/or wiring money obtained during the smuggling event to coconspirators elsewhere.  On September 2, 2022,

TV-5 arrived back in Los Angeles at approximately 9:50 a.m., and the third individual was not observed getting out of the vehicle. Based on my training and experience, I believe CRUZ and S-9 transported an undocumented individual from H-1 to the residence in Kirkland, Washington.

30.    On September 7, 2022, Honorable Margo A. Rocconi, United States Magistrate Judge for the Central District of California, issued a federal search warrant authorizing an additional 14 days to execute the August 16 Warrant at H-1. This warrant was filed in the Central District of California as 22-MJ-3528.

31.    On September 8, 2022, UC-1 spoke to two individuals using Mexican phone numbers who directed UC-1 to a location on I-8 east of Jacumba to pick up undocumented aliens. UC-1 picked up two undocumented aliens at that location. UC-1 then received instructions to drive towards a casino in Alpine, California. Once at the casino, UC-1 received directions to drive to a mall in Commerce, California. En route, a person called UC-1 and spoke with the undocumented individuals. Smugglers often do this to verify who has been picked up so they may contact sponsors to arrange pick up and payment. Afterwards, UC-1 received a WhatsApp message from T-3 (the contact was named "R6") directing UC-1 to 1455 S. Atlantic Blvd., Los Angeles, the address for the Winchell's.

32.    UC-1 thereafter stopped the car, agents arrested the two aliens, and two plainclothes agents took their place. UC-1 drove to the Winchell's and parked. While there, an individual on a phone rode a bike past two surveillance vehicles. Immediately after, UC-1 received a voice message from T-3 indicating police were following UC-1.

33.    After UC-1 received the voice message, agents served the search warrant at H-1. Agents escorted the individuals inside H-1 and the corresponding garage outside so they could begin the search, and several of the individuals recorded the agents on cellphones. After moving everyone outside, agents determined that CRUZ was not in H-1 or the corresponding garage. Based on a later review of the pole camera recording, an individual agents believe to be CRUZ was in the alley outside H-1 when UC-1 arrived. Agents have been monitoring the pole camera since June 27, 2022, and have observed

CRUZ numerous times. I believe it was CRUZ in the alley on September 8, 2022, because the person in the alley's appearance matched agents' prior observations of CRUZ's stature and attire. The pole camera further showed that CRUZ entered an open garage two doors down from the garage associated with H-1, and that garage door closed as agents moved down the alley to serve the search warrant. Agents believe CRUZ remained in the vicinity (in the other garage or in a different apartment in the complex) throughout the search.

34.     During the service of the warrant, agents seized numerous items, including approximately $28,000 in U.S. currency, 28 phones (including the **Target Devices**), and a .40 caliber Glock handgun with the serial number removed. **Target Device 1** and **Target Device 3** were found in the garage associated with H-1 and agents observed that both devices' screens were on, indicating that they had recently been used. **Target Device 2** was found in a bedroom containing CRUZ's credit cards and driver's licenses and a picture of CRUZ and his wife was hanging on the wall of the room.

35.     Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**.  In light of the above facts and my experience and training, there is probable cause to believe that CRUZ was using the **Target Devices** to communicate with others to further illegal entry into the United States.  Based on my training and experience, it is also not unusual for individuals, such as CRUZ, to attempt to minimize the amount of time one was involved in the smuggling activities, and for the individual to be involved for weeks and months longer than they claim.  Accordingly, I request permission to search the **Target Devices** for data beginning on January 20, 2022 (the date of S-1's arrest), up to and including September 9, 2022 (the day after the search warrant at H-1 was executed).

**METHODOLOGY**

36.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

37.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

38.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

39.    Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

40.    Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of alien smuggling in violation of 8 U.S.C. § 1324 and bulk cash smuggling in violation of 31 U.S.C. § 5332.

41.    Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachment A-1, A-2, and A-3, and d seize the items listed in Attachment B using the above-described methodology.


I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Alexander C. Susral, Jr.
Border Patrol Agent


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26 day of September 2022.

_____
Honorable Andrew G. Schopler
United States Magistrate Judge

## **ATTACHMENT A-1**

### PROPERTY TO BE SEARCHED

The following property is to be searched:

      Cellphone in Joker Case
      FP&F No. 2022565600013601 Item 0010
      (**"Target Device 1"**)

**Target Device 1** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector located at 311 Athey Avenue, San Ysidro, California 92173.

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1, A-2, and A-3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **January 20, 2022, up to and including September 9, 2022**:

a.   tending to indicate efforts to smuggle aliens from Mexico into the United States and facilitate the transportation of smuggled aliens within the United States;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.   tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and the transportation of smuggled aliens;

d.   tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

all of which are evidence of violations of 8 U.S.C. §§ 1324 (a)(I)(A)(i), (A)(ii), (A)(v)(i), and (A)(v)(ii).